IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 24-00089 MWJS |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS [DKT. NO. 89] |
| vs. | AND MOTIONS TO SUPPRESS [DKT. NOS. 90, 91] |
| DUANE F.K. DAWSON, | |
| Defendant. | |

## INTRODUCTION

This is a criminal case involving drug trafficking and firearm-related charges.  In advance of the trial scheduled for March 2, 2026, Defendant Duane F.K. Dawson filed a motion to dismiss the current indictment against him, Dkt. No. 89; a motion to suppress evidence obtained from the search of two mail parcels, Dkt. No. 90; and a motion to suppress the fruits of an automobile search, Dkt. No. 91.  The government opposes each motion.  Dkt. Nos. 96–98.

The court held an evidentiary hearing on Dawson's suppression motions on January 12, 2026.  Having considered the record and filings in this case, the arguments of counsel, and the credibility of the witnesses who testified at the hearing, the court DENIES each of Dawson's motions.

## BACKGROUND

### A.    The Charges

The charges in this case—which have been brought in a Superseding Indictment, Dkt. No. 30—concern alleged activities in both April 2024 and December 2024.  The April 2024 charges stem from searches performed by officers with the Kaua'i Police Department (KPD); those searches turned up drugs, guns, and other drug and gun-related evidence.  The December 2024 charges are the result of the United States Postal Inspection Service's (USPIS) search of two mail parcels (which were found to contain substantial amounts of methamphetamine), as well as law enforcement's controlled delivery of one of those parcels and subsequent search of Dawson's automobile (which resulted in the recovery of a firearm, ammunition, drugs, and other drug-related evidence).

Dawson is charged in ten counts.  Counts 1, 2, 5, and 7 charge a variety of drug trafficking offenses, collectively in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 841(b)(1)(C).  Of these, Counts 5 and 7 allege conduct in April 2024, while Counts 1 and 2 allege conduct in December 2024.

Counts 3, 6, 8, and 10 charge firearm-related offenses.  Count 3 charges that on or about December 5, 2024, Dawson possessed ammunition after sustaining a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  Counts 6 and 10 similarly charge possession of ammunition after sustaining a felony conviction, but on

or about April 11, 2024.  And Count 8 charges possession of both a firearm and ammunition on or about April 11, 2024, in violation of the same statutory provisions.

The last two counts blend drug trafficking and firearm-related conduct.  Count 4 charges that on or about December 5, 2024, Dawson possessed a firearm in furtherance of a drug trafficking crime, namely, the charges charged in Counts 1 and 2, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Count 9 charges that on or about April 11, 2024, Dawson possessed multiple firearms—including two equipped with firearm silencers and mufflers—in furtherance of the drug trafficking crime charged in Count 7, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(B)(i), and 924(c)(1)(B)(ii).

Dawson's motion to dismiss leaves the drug trafficking charges (Counts 1, 2, 5, and 7) untouched, but argues that the remaining counts should be dismissed.  Dawson's motions to suppress, meanwhile, do not challenge evidence obtained in April 2024, but instead focus solely on the investigative work performed in December 2024.

B.    The Facts

The court held an evidentiary hearing on Dawson's suppression motions.  The government called two witnesses at that hearing:  Jeffrey Labuguen, a Task Force Officer (TFO) with USPIS who played a lead role in laying the groundwork for the December 2024 investigative work; and USPIS Postal Inspector Melanie Ramirez, who assisted with carrying out the December 2024 investigative work.  The court finds that both TFO Labuguen and Inspector Ramirez testified truthfully; it bases this finding not

3

only on the fact that their testimony was consistent with other evidence and filings in the record, but also based on the court's observation of their demeanor in court.

Dawson sought to call Amy Marie Smith, whom he describes as having been his girlfriend, the owner of the vehicle that investigators searched in December 2024, and the resident of the apartment to which the two December 2024 mail parcels were addressed. But Smith, who is represented by her own counsel, invoked the protections of the Fifth Amendment in response to each of the specific questions that Dawson's counsel proposed, and the court sustained those invocations. Nonetheless, Dawson's counsel proffered what he hoped Smith would have said in her testimony, and Smith's counsel also proffered some information. To ensure a full consideration of Dawson's contentions, the court has also taken into consideration these proffers of what Smith likely would have testified had she not invoked. *See infra* p.24 n.5.

The parties also offered a stipulation of the testimony former KPD Officer Blake Saito would have provided had he been called to testified. Dkt. No. 129. And the court admitted government exhibits 1-8, 8a-8c, 9-14, 14a, and 15-21 into evidence.[1]

From that evidence, together with the filings in this case, the court finds the following facts:

---

[1] Dawson also submitted exhibits of his own, Dkt. No. 125, but withdrew them after the court sustained Smith's invocations of the Fifth Amendment. In any event, as the government observed, Dawson's proposed exhibits were largely redundant of the government's own.

4

### 1.    The Mail Parcels

In April 2024, KPD personnel executed four state search warrants on locations associated with Dawson.  They recovered, among other things, the following items:

- First, from Dawson's residence located at 3-3840 Kuhio Highway, Lihue, Hawaiʻi (the "Dawson Residence"), KPD recovered, among other things, ammunition, a firearm magazine, methamphetamine, and drug paraphernalia.

- Second, from Smith's residence located at 4620 Kalepa Circle, Lihue, Hawaiʻi (the "Smith Residence"), KPD recovered a revolver, a rifle with a suppressor attached, a rifle with collapsible stock, a firearm muzzle brake, ammunition, over 200 grams of pure methamphetamine, marijuana, and a digital scale.

- Third, from a vehicle that Dawson was operating shortly before his arrest on April 11, 2024, KPD recovered ammunition, methamphetamine, marijuana, and drug paraphernalia.

- Finally, from a vehicle that Dawson was operating shortly before his arrest on April 16, 2024, KPD recovered approximately 50 grams of methamphetamine, a digital scale, and a pipe with residue that tested positive for methamphetamine.

Despite his arrests on April 11 and 16, in the months after the recovery of this evidence, Dawson remained at liberty.

By October 2024, KPD personnel began to suspect that Dawson was receiving parcels containing drugs that were sent from the continental United States to the Smith Residence.  And so on October 25, 2024, then-KPD Officer Blake Saito notified TFO Labuguen that the Smith Residence was the subject of an ongoing firearms and narcotics investigation.  Dkt. No. 129.

5

On Tuesday, November 26, 2024—two days before Thanksgiving—TFO Labuguen conducted a review of mail in transit to Hawai'i, and identified two parcels (the "Subject Parcels") that had been sent from Victorville, California, on November 23, 2024, and had since arrived on Kaua'i.  TFO Labuguen observed that each Subject Parcel was addressed to "A. Smith" at the Smith Residence, and that each bore the return address of "J. Smith" at "17415 Catalpa St Hesperia CA 92345."  The sender and addressee information was handwritten.  Each Subject Parcel was a box weighing slightly over six pounds.

TFO Labuguen found the Subject Parcels to be suspicious for five reasons:

- First, TFO Labuguen reviewed law enforcement databases and determined that the sender's name—"J. Smith"—was not associated with the sender's listed California address.  TFO Labuguen was aware, from his training and experience, that individuals who mail controlled substances through the United States Postal Service (USPS) will enter fictitious sender addresses as a way of shielding their identity and protecting themselves from potential liability.[2]

- Second, TFO Labuguen was aware that California was a source state for controlled substances mailed to Hawai'i, and that Victorville, California, in particular, is a known source city for such substances.

---

[2]     In his search warrant affidavits, TFO Labuguen asserted that the "addressee" name (i.e., "A. Smith") was not associated with the "addressee" address (i.e., the Smith Residence).  *See* Dkt. No. 105, at PageID.656 (¶ 10).  In his testimony at the evidentiary hearing, TFO Labuguen explained that this was an inadvertent error, and that he intended to convey that the sender's listed name did not match the sender's listed address.  Having heard TFO Labuguen's testimony in open court and evaluated his demeanor, the court finds that he testified truthfully.

- Third, United States Postal Service (USPS) records showed that the person who sent the Subject Parcels paid for each in cash, which TFO Labuguen understood to be a way for a sender to insulate their identity.

- Fourth, TFO Labuguen knew that the Subject Parcels were shipped via Priority Mail, and TFO Labuguen knew that it is common practice for shippers of controlled substances to use USPS Priority Mail services because the parcels are trackable, usually arrive within a specified period of time, and are a sealed class of US mail that is constitutionally protected.

- Fifth, TFO Labuguen observed that the Subject Parcels were shipped on the same day, and based on his training and experience, he was aware that shippers of controlled substances or proceeds from the sale of such substances sometimes mail multiple parcels on the same day, knowing that if even one or more of the mailings are intercepted by law enforcement, others are still likely to reach their destination.

In finding this collection of facts to give rise to reasonable suspicions, TFO Labuguen relied on his training and experience, which included work as an officer with HPD since 2010, a TFO with USPIS beginning in January 2024, a prior stint as a TFO with the Drug Enforcement Administration (between July 2021 and July 2024), and before all of that, work as a deputy sheriff in Los Angeles.  TFO Labuguen's experience in these roles included involvement in numerous drug-related arrests, numerous search warrants and surveillance operations, debriefing of narcotics traffickers following their arrest, and participation in drug trafficking investigations in which court-authorized wire interception was used.  Dkt. No. 105, at PageID.654 (¶ 4).  Based on this training and experience, TFO Labuguen has become "well versed in the methodology utilized in narcotics trafficking operations," as well as "the unique trafficking patterns employed by narcotics organizations."  *Id.*

7

Based on his suspicions, on Wednesday, November 27, 2024—the day before Thanksgiving—TFO Labuguen arranged for the Subject Parcels to be transported from Kauaʻi to USPIS's offices in Honolulu, Hawaiʻi.  TFO Labuguen received the Subject Parcels on Saturday, November 30, 2024.  Upon handling them, TFO Labuguen observed that each Subject Parcel appeared to have a similar heavy center mass.  Through his training and experience, TFO Labuguen knew this characteristic to be consistent with parcels USPIS seized in Hawaiʻi in the past that were found to contain controlled substances.  TFO Labuguen also observed that the Subject Parcels were excessively taped, especially at their seams and corners.  From his training and experience, TFO Labuguen knew that individuals who use USPS to send controlled substances will often use excessive tape to mask or conceal the substances from mail handlers and narcotics detection canines.

And so, on Monday, December 2, 2024, the Subject Parcels were presented to a Honolulu Police Department (HPD) narcotics detection canine, which exhibited a change in behavior and alerted to the presence of a controlled substance.  That same day, TFO Labuguen obtained a search warrant to search the contents of the Subject Parcels.  Dkt. No. 103.  TFO Labuguen executed the search warrant later that day and recovered, among other things, a white crystalline substance with an approximate weight of 2,395 gross grams.  The substance field tested positive for the presence of methamphetamine.

On December 5, 2024, TFO Labuguen obtained an anticipatory search warrant to search the Smith Residence for one of the Subject Parcels.  As TFO Labuguen explained in his affidavit in support of the requested search warrant, USPIS postal inspectors intended to make a controlled delivery of the Subject Parcel (with pseudo-methamphetamine replacing the methamphetamine, and with devices installed to indicate when the Subject Parcel was put in motion and when it was opened) to the Smith Residence.  Dkt. No. 106, at PageID.802-03 (¶ 10).

### 2.    The Automobile Search

After obtaining the anticipatory search warrant, USPIS and KPD executed a controlled delivery of the Subject Parcel to the Smith Residence.  They placed the Subject Parcel into a mail locker and placed the key to that locker in the mailing box belonging to the Smith Residence.  Law enforcement established surveillance of the Smith Residence, as well as of the Dawson Residence, where Dawson was observed driving a silver Jeep.  This Jeep was a different vehicle from the ones he was driving in April 2024; the Jeep was registered to Smith.  *See, e.g.*, Gov't Ex. 15, at p.2 (citation to Smith for "your registered vehicle" lacking a "current safety check").

At approximately 6:04 p.m., law enforcement observed a male individual carry the Subject Parcel up a staircase leading to the entrance of the Smith Residence and hand it to Smith, who then entered the Smith Residence with the parcel.  At approximately 7:40 p.m., Dawson—the driver and sole occupant of the silver Jeep—

drove into the parking lot of the apartment complex in which the Smith Residence was located.  Dawson parked his Jeep in parking stall #143, and was then observed exiting the Jeep and entering the Smith Residence at approximately 7:46 p.m.  Then, at about 7:56 p.m., the Subject Parcel's beeper indicated movement, and continued to emit the "motion detected" tone while law enforcement observed Dawson leaving the Smith Residence, now with a green duffle bag slung over his shoulder.  Law enforcement continued to observe Dawson as he descended the apartment complex's stairs, opened the passenger side back seat of the Jeep, and placed the duffle bag in the back seat.  The Subject Parcel's "motion detected" tone stopped once Dawson had placed the duffle bag there.  Dawson then walked over to the driver side door of the car, returned to the passenger side, and was reaching through the front passenger side window when law enforcement decided to approach and detain him.  Dawson thereafter spontaneously uttered:

> Oh, the box!  That's not even my box!  My girlfriend called me and said there's a box.  I came over to check on my family because there's no electricity, couple days already.  I came over, had dinner and she told me about the box.  I took the box but that's not our box.[3]

---

[3]  The description of this spontaneous utterance is somewhat different in the affidavit in support of the criminal complaint in this case, *see* Dkt. No. 1, at PageID.7, but the differences are not material to any issue presented here.

At approximately 8:11 p.m., a postal inspector with USPIS opened the rear passenger seat door of Dawson's Jeep, saw the green duffle bag, opened it, and recovered the Subject Parcel.

At that time, the law enforcement officers working together on this investigation were collectively aware of, among other things, the following:  (1) KPD's four prior state search warrants and the evidence recovered from those warrants, including the ammunition, methamphetamine, and drug paraphernalia recovered from vehicles Dawson had been operating; (2) the fact that, in the months before the December 2024 investigative actions, law enforcement had received information that Dawson was receiving parcels containing methamphetamine intended for further distribution, and that those parcels were addressed to the Smith Residence; (3) the fact that USPIS had, just a few days earlier, intercepted the Subject Parcels, which contained over 2,000 gross grams of a substance testing positive for methamphetamine; and (4) the fact that, within two hours of the Subject Parcel being taken into the Smith Residence on December 5, 2024, Dawson arrived at the Smith Residence, and spent only 16 minutes within the Smith Residence before the tracking devices indicated the movement of the Subject Parcel.  These same law enforcement officers were collectively aware of Dawson's extensive criminal history, which includes convictions for felonies.

Armed with this information—but lacking a search warrant—law enforcement did not stop after retrieving the Subject Parcel, but instead conducted a full search of the

Jeep.  During this search, they observed a fanny pack on the front passenger seat.  Upon searching the fanny pack, law enforcement recovered a privately manufactured firearm with an inserted magazine containing ammunition, an amount of fentanyl, cocaine, methamphetamine, and drug paraphernalia.

While it was being searched, the silver Jeep remained in parking stall #143, where Dawson had parked it before heading to the Smith Residence.  Parking stall #143 was not assigned to Smith; instead, Smith's assigned stalls were #80 and #81.  *See* Gov't Ex. 9.  And Smith was only authorized to use or allow her guests to use those assigned stalls.  The rules of the apartment complex housing the Smith Residence explicitly provided that "[t]enants shall not use or permit their family, guests or invitees to use the parking stalls of other Tenants."  Gov't Ex. 15, at p.2.

## DISCUSSION

Dawson moves to suppress evidence obtained through USPIS's seizure and search of the Subject Parcels and law enforcement's search of his Jeep.  He separately moves to dismiss all of the firearm-related charges against him—that is, Counts 3, 4, 6, 8, 9, and 10.  The court first considers the motions to suppress, and then turns to the motion to dismiss.

### A.    The Motions to Suppress

Dawson has filed two motions to suppress.  *See* Dkt. Nos. 90, 91.  In the first, he argues that evidence obtained from the Subject Parcels—which included 2,395 grams of

12

a substance that field tested positive for methamphetamine—should be suppressed, because the rerouting of the Subject Parcels from Kaua'i to Honolulu was a seizure that is unconstitutional without a warrant.  In the second, he contends that the warrantless search of his Jeep was unconstitutional because his vehicle was parked in the curtilage of the Smith Residence, and because the search exceeded the scope of probable cause.

At the threshold, the government argues that Dawson lacks standing to pursue either of these suppression motions.  In making this argument, the government relies on the principle that a person lacks a sufficient privacy or possessory interest in a package if they were "neither the sender nor the addressee of the package" and the "parcel was not addressed to him or a physical location associated with him."  *United States v. Notyce*, Cr. No. 16-00556, 2017 WL 5137584, at *5 (D. Haw. Nov. 6, 2017).  But while Dawson was not the sender or addressee of the Subject Parcels, the evidence *does* support the conclusion that they were addressed to "a physical location associated with him"—namely, the Smith Residence.  For one thing, the government itself has asserted that the Smith Residence was a "location[] associated with the Defendant in 2024."  Dkt. No. 97, at PageID.524 (arguing that the recovery of drugs, firearms, ammunition, and other items from the Smith Residence in April 2024 supports a finding of probable cause against Dawson).  For another, the Superseding Indictment alleges that items recovered from the Smith Residence in April 2024 belonged to Dawson.  *See, e.g.*, Dkt. No. 30, at PageID.113.  And given Dawson's undisputed association with the Smith Residence, it

13

is not obvious why he would lack standing to challenge the seizure of parcels mailed to that address.

The government separately relies on the principle that "[b]ecause warrantless searches or seizures of abandoned property do not violate the fourth amendment," persons who "voluntarily abandon property lack standing to complain of its search or seizure." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). But while it is true that after Dawson was confronted outside the Smith Residence, he exclaimed that the Subject Parcel was not his, that utterance is not necessarily inconsistent with a conclusion that Dawson received—at the Smith Residence, a physical location associated with him—the Subject Parcels and took physical control of them, even though he (allegedly) was not expecting to receive them and suspected they might have been sent to him in error. A person who receives a mailing by mistake, but nonetheless intends to retain physical possession of it (perhaps to bring it back to the post office), does not obviously abandon their Fourth Amendment rights in the mailing. *See id.* (explaining that abandonment turns not only on "denial of ownership" but also on "physical relinquishment of property"). Dawson's reported statement could, conceivably, be understood as claiming or asserting something along these lines.

But the court need not definitively resolve this threshold question of standing. That is because, even assuming Dawson has standing to advance his suppression motions, those motions fail on the merits.

14

1.      **The Subject Parcels**

In seeking to suppress evidence obtained from USPIS's search of the Subject

Parcels, Dawson relies principally on *United States v. Jones*, 565 U.S. 400 (2012), in which

the Supreme Court found that government agents had engaged in a Fourth

Amendment search when they installed a GPS device onto an individual's vehicle and

then used that device to monitor the vehicle's movements for over nearly a month.  As

Dawson notes, several courts have, since *Jones*, held that even minimal physical

touching implicates the Fourth Amendment.  Dkt. No. 90, at PageID.470.  That

principle, indeed, predates *Jones*.  *See, e.g., Silverman v. United States*, 365 U.S. 505, 511-12

(1961).

From that principle, Dawson urges the conclusion that when TFO Labuguen

diverted the Subject Parcels from their destination on Kauaʻi to USPIS's offices in

Honolulu, the physical touching—and interference with the property—constituted a

Fourth Amendment seizure.  Because it was conducted without a warrant, Dawson

reasons that it must be held per se unconstitutional.

a.      **Law Enforcement Did Not Need a Warrant to Divert the
        Subject Parcels from Kauaʻi to Honolulu**

The flaw in Dawson's argument is that it relies on cases in which government

touches or intrudes upon property it has not been authorized to touch or handle.

Parcels placed in the USPS mail service are differently situated.  As the Ninth Circuit

has held, a "person who voluntarily deposits mail in the United States mail for

15

delivery" retains only a "limited possessory interest in the mailed item." *United States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002).  That is because "[a]lthough a person has a legitimate interest that a mailed package will not be opened and searched en route," there "can be no reasonable expectation that postal service employees will not handle the package or that they will not view its exterior." *Id.* at 1209–10.[4]

Dawson, of course, did not send the Subject Parcels; he instead claims that they were addressed to a physical location associated with him—the Smith Residence—and that his interest is therefore in the Subject Parcels not being diverted from their course. But the Ninth Circuit has held that even a recipient's Fourth Amendment interests are limited:  "The recipient of a mailed item," the circuit has explained, only "has a reasonable expectation that the mail will not be detailed by postal employees beyond the normal delivery date and time." *Id.* at 1210.  Put differently, "an addressee's possessory interest is in the timely delivery of the package, not in having his package routed on a particular conveyor belt, sort in a particular area, or stored in any particular sorting bin for a particular amount of time." *Id.* (cleaned up).

_____

[4]    Because mail parcels present a materially different context and set of considerations from those discussed in *Jones*, the Ninth Circuit's decision in *Hernandez* is readily reconciled with *Jones*, even if—as Dawson contends—there might exist some tension between the two decisions.  Where, as here, binding Ninth Circuit precedent is not "clearly irreconcilable" with intervening Supreme Court decisions, this court must follow the Ninth Circuit precedent.  *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).  Dawson nonetheless has preserved his contention that the Ninth Circuit should revisit its precedents in light of *Jones*.

16

The Ninth Circuit has explained how these doctrines shake out in the investigative context: "Postal inspectors may detain a package to conduct an investigation 'if they have a reasonable and articulable suspicion' that it contains contraband or evidence of illegal activity.'"  *Id.* (quoting *United States v. Aldaz*, 921 F.2d 227, 229 (9th Cir. 1990)).  And "[e]ven if the initial seizure of a mailed package is based on reasonable suspicion, a prolonged detention is unreasonable under the Fourth Amendment."  *Id.* at 1212; *see also United States v. Dass*, 849 F.2d 414 (9th Cir. 1988) (holding that the detention of packages from seven to twenty-three days after they had probable cause to obtain a search warrant was unreasonable because, under the circumstances, the delay could have been much shorter had the authorities acted more diligently).  Critically for present purposes, the Ninth Circuit has held that transporting a parcel for which there is reasonable suspicion is appropriate so long as it does not result in unreasonable delay.  *See Aldaz*, 921 F.2d at 231 (concluding that two days to transfer the packages from a remote Alaskan village to another city for a dog sniff was reasonable).

These precedents undermine Dawson's argument that the mere fact that the Subject Parcels were transferred from Kauaʻi to Honolulu without a warrant automatically violated the Fourth Amendment.

//

//

17

**b.      Law Enforcement Did Need Reasonable Suspicion to Divert the Subject Parcels, But They Had It**

There remains the question of whether law enforcement had sufficient reasonable suspicion to make that transfer, as well as whether law enforcement acted with sufficient dispatch for the diversion to qualify as reasonable under the Fourth Amendment.  In assessing whether reasonable suspicion exists, the court must consider the totality of the circumstances, allowing officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," even if that information "might well elude an untrained person."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up).

On the facts as this court has found them, TFO Labuguen did indeed have sufficient reasonable suspicion to divert the Subject Parcels from Kaua'i to Honolulu for inspection.  TFO Labuguen testified that the listed sender name did not match the listed sender address, and from his training and experience, he knew that this was a common technique used by shippers of controlled substances to conceal their identity.  TFO Labuguen also knew that the Subject Parcels bore various other indicia of possible drug trafficking:  the sender paid for each in cash (allowing their identity to be concealed), sent them via Priority Mail (thus making them trackable), and sent both separate parcels at the same time (increasing the odds that at least one parcel might evade law enforcement interception).  And he was aware that Victorville, California—the listed sender address—is a known source city for drugs.

18

These facts compare favorably with *Hernandez*, in which the Ninth Circuit held that law enforcement officers had sufficient reasonable suspicion to detain a parcel.  313 F.3d at 1210-12.  The grounds for reasonable suspicion there included that the name of the return addressee could not be confirmed; the package was shipped by express mail; the label on the package was handwritten; the package had been mailed to Hawaiʻi from California; and the package had been taped up "fairly well."  *Id.*  Although TFO Labuguen's grounds for reasonable suspicion in this case are not a point-by-point match to those in *Hernandez*, they compare favorably to the facts of that case.  And as was the case with the agent in *Hernandez*, TFO Labuguen viewed the facts before him in the light of his training and extensive experience.

Once the Subject Parcels arrived in Honolulu, TFO Labuguen's visual inspection of them offered additional grounds for reasonable suspicion, including that the parcels had a heavy center mass consistent with past drug parcels, and that the Subject Parcels were heavily taped, especially in the seams and corners.  And, of course, Dawson does not dispute that once the HPD canine alerted to the presence of narcotics, law enforcement had probable cause to conduct a search of the contents of the Subject Parcels.

Nor does Dawson meaningfully argue that law enforcement's detention of the Subject Parcels was unreasonably prolonged, and the facts of this case would not support that argument.  TFO Labuguen arranged for the Subject Parcels to be

transported to Honolulu on Wednesday, November 27, 2024—the day before

Thanksgiving—and they arrived on Saturday, November 30, 2024.  TFO Labuguen then

arranged for the HPD canine to inspect the Subject Parcels on the next business day,

Monday, December 2, 2024.  Under the circumstances, the court concludes that TFO

Labuguen acted with reasonable dispatch.  *Accord United States v. Gill*, 280 F.3d 923, 929

(9th Cir. 2002) (holding that a delay of six days was constitutionally reasonable, and

offering the reminder that "the main Fourth Amendment interest in a mailed package

attaches to the privacy of its contents, not the speed with which it is delivered").

The upshot is that no basis exists to suppress the evidence recovered from the

Subject Parcels.  The diversion of the parcels from Kaua'i to Honolulu was supported

by reasonable suspicion, and the delay for further investigation was not unreasonably

prolonged.  Dawson's motion to suppress that evidence is, accordingly, DENIED.

### 2.    The Automobile Search

Dawson next moves to suppress evidence obtained from the warrantless search

of the silver Jeep he was driving on December 5, 2024.  His principal argument is that

law enforcement could not conduct any warrantless search at all, because the vehicle

was parked in the curtilage of the Smith Residence.  Alternatively, he argues that even if

it had been constitutionally reasonable to search the vehicle for the green duffle bag

containing the Subject Parcel, law enforcement did not have sufficient probable cause to

search the entire vehicle (which resulted in, among other things, the recovery of the

privately manufactured firearm in the fanny pack).  The court considers each argument in turn.

> ### a.    Parking Stall #143 Did Not Form Part of the Curtilage of the Smith Residence

The Fourth Amendment protects against unreasonable government searches and seizures not only of one's person, but also of one's "houses, papers, and effects." Among those items of property, "the home is first among equals." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (cleaned up).  And so "[t]o give full practical effect" to the protection of the home, the Supreme Court "considers curtilage—the area immediately surrounding and associated with the home—to be part of the home itself for Fourth Amendment purposes." *Id.* (cleaned up).

Dawson concedes, as he must, that law enforcement ordinarily need not secure a search warrant to search a vehicle because of the doctrine known as the "automobile exception" to the Fourth Amendment.  But Dawson points out that this exception is available only if law enforcement agents conduct the search in an area where they are allowed to be present without a warrant.  And the curtilage of one's home is, presumptively, not such a place.  Or as the Supreme Court has put it, "the automobile exception" does not justify "the invasion of the curtilage." *Id.* at 594.  That is because "[j]ust as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant, and just as an officer must have a lawful right of access in order to arrest a person in his home, so, too, an officer must

have a lawful right of access to a vehicle in order to search it pursuant to the automobile exception." *Id.* at 596.

The government accepts these principles but contends that the silver Jeep was not located in the curtilage of the Smith Residence.  To assess this argument, the court must "look at four factors:  '[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Chong v. United States*, 112 F.4th 848, 856 (9th Cir. 2024) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)). The "absence of a factor does not mean that the area is not within a home's curtilage"; the "key consideration is whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *Id.* (cleaned up).

There is, to be sure, some precedent that arguably supports the conclusion that a "parking space" in an "apartment complex parking lot is not part of the curtilage" of an apartment.  *Mack v. City of Abilene*, 461 F.3d 547, 553–54 (5th Cir. 2006) (holding that a search warrant that by its terms only authorized the search of an apartment did not impliedly cover the parking lot).  But because the court has not uncovered any binding precedent compelling that conclusion as a matter of law, it will instead consider the particular facts of this case as they bear on the four curtilage factors.

22

       **i.  *Proximity to the Home.***  The silver Jeep was in parking stall #143 of the apartment complex in which the Smith Resident is located.  In arguing that this stall is sufficiently close or proximate to the Smith Residence to support a finding of curtilage, Dawson generally asserts that it is "within the proximity of the apartment."  Dkt. No. 109, at PageID.693.  Although there is some uncertainty in how the proximity standard should apply to an apartment complex such as this—and although the record leaves some factual ambiguity as to precisely how far from the Smith Residence parking stall #143 is located—the court concludes that, under the particular facts of this case, parking stall #143 is not so close to the Smith Residence as to support a finding of curtilage.

       First, the evidence shows that the Smith Residence is on the second floor of that section of the apartment complex, and so a flight of stairs—with no indicia of being limited to any particular tenant's use—separates parking stall #143 from the Smith Residence.  *See, e.g.*, Gov't Ex. 8a (blue "x" marking the Smith Residence and red "x" marking parking stall #143).

       Second, the evidence also shows that a sidewalk—again with no indicia of being limited to any tenant's use—runs between parking stall #143 and the Smith Residence.  *See, e.g.*, Gov't Ex. 8a, 8b, 8c.  One does not ordinarily think of a parking lot separated from a home by a common-use sidewalk as being "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection."  *Depew*, 210 F.3d at 1066-67 (cleaned up).

23

Third, nothing in the layout of parking stall #143 suggests that it is physically or spatially linked to any apartment in the Smith Residence. Instead, it appears simply as one in a long row of parking stalls abutting the sidewalk that separates the road and parking stalls from the apartment complexes. That is to say, the apartment complex does not physically place any individual parking stall in close proximity to any individual apartment unit. Any resident of the apartment complex might readily walk through any of the individual parking stalls on the way to their own assigned stall. And no reasonable observer would conclude that any parking stall is physically situated within the intimate space of any apartment unit. What is more, as Inspector Ramirez testified, other apartments units in the complex are physically closer to parking stall #143 than the Smith Residence. Under these circumstances, no reasonable observer would say that parking stall #143 is so proximate to the Smith Residence on the second floor of the apartment complex as to fall within its intimate space.

**ii. *Enclosure Surrounding the Home.*** Dawson does not suggest that parking stall #143 falls within any enclosure of the Smith Residence, but he does argue that parking stalls in the apartment complex "are generally surrounded" by the apartments. Dkt. No. 109, at PageID.693. Dawson's theory is that parking stall #143 falls within the perimeter of the apartment complex, and can be viewed as falling within the boundaries of this collection of apartments.

24

But the Supreme Court's decision in *United States v. Dunn* teaches that the question is not whether there is any fencing at all, but instead whether the fencing at issue marks "the area around the home to which the activity of home life extends."  480 U.S. at 302.  That is why, in *Dunn*, the court held that a "fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house," but that, at the same time, a barn and its front portion "enclosed by a fence" were a "distinct portion" of a ranch, "quite separate from the residence."  *Id.*

In this case, the parking stalls all lie within land plainly designated as part of the apartment complex, *see, e.g.*, Gov't Ex. 12, but those perimeter designations are not a fair measure of the curtilage of anyone's apartment.  Inspector Ramirez testified at the evidentiary hearing that law enforcement agents were able to freely enter and exit the apartment complex; there was no guard hut, entrance gate, or other impediment to any member of the public walking through the interior common spaces.  The outer boundaries of the apartment complex, therefore, do not mark out the intimate spaces of any apartment unit within the complex.

And there is no dispute that neither Smith nor Dawson placed any interior enclosure to demarcate parking stall #143 as being part of the Smith Residence in particular.  Indeed, the undisputed evidence shows that neither could have legally placed any such enclosure in place, because parking stall #143 was not assigned for

Smith's use.  Whenever Smith or one of Smith's guests parked their vehicle in parking

lot #143, the rules of the apartment complex allowed it to be towed without prior notice.

It follows *a fortiori* that Smith and Dawson could not permissibly cordon off parking

stall #143 for their own privacy or use.

In any event, whatever the reason for their failure to take any steps to cordon off

or enclose parking stall #143, the fact is that they did not do so.[5]  That fact weighs

heavily in favor of a finding that parking stall #143 does not constitute curtilage of the

Smith Residence.

**iii.  *Nature of the Uses.***  The "use" factor asks whether "law enforcement officials

possessed objective data indicating that the [location] was not being used for intimate

activities of the home."  *Dunn*, 480 U.S. at 302.  Inspector Ramirez testified at the

evidentiary hearing that she participated in surveillance at the apartment complex in

the hours before law enforcement searched the silver Jeep, and while there, she did not

observe Dawson or Smith—or anyone—engage in any private or intimate activities in

parking stall #143.  Nor did she observe any indicia that the stall ever was used for

those purposes; she saw no tables, lawn chairs, barbeque grills, or any other items that

---

[5]      That is why it does not avail Dawson to proffer, as he has, that if Smith had not
invoked the Fifth Amendment and instead testified, she would have said that she told
Dawson (or at least led him to believe) that parking stall #143 was indeed assigned to
her and that both she and he could properly use it as they wished.  That testimony, had
it come in, would have only highlighted that despite (allegedly) believing that they had
complete control over parking stall #143, neither Dawson nor Smith took any steps to
enclose it or shield their activities in that space from the view of others.

might suggest the parking stall was used for any activities of the home. Instead, the only evidence of use was that Dawson parked the silver Jeep there—and then brought back into the Jeep a Subject Parcel that had previously contained a substantial amount of a substance testing positive for methamphetamine—with no objectively reasonable expectation that neighbors or any other passersby could not observe everything he did, just as if he had parked in a parking lot of a grocery store. The use factor therefore weighs heavily against a finding of curtilage.

iv. *Visibility.* The final factor "focuses on the steps taken" to "prevent observation of the area from passers-by." *United States v. Johnson*, 256 F.3d 895, 903 (9th Cir. 2001) (en banc) (opinion of Ferguson, J.). Here, the record establishes that Dawson and Smith did nothing to shield parking stall #143 from the view of anyone standing nearby. Indeed, as Inspector Ramirez's testimony demonstrates, Dawson's activities while he was in parking stall #143 were entirely visible to law enforcement agents in the nearby area, just as they would have been entirely visible to any of Dawson's neighbors or individuals visiting those neighbors. The record thus compels the conclusion that Dawson "did little to protect the [parking stall] from observation by those standing" nearby. *Dunn*, 480 U.S. at 303.

Dawson resists this conclusion, contending that this fourth factor is not fairly "applicable to communal housing" like an apartment complex. Dkt. No. 109, at PageID.693. He notes that "no resident of the complex could take steps to protect either

27

their individuals spaces or any space for that matter." *Id.* at 693-94.  But record does not

bear out that assertion.  Nothing in the record suggests that the residents of this

apartment complex were unable to protect the privacy of their apartments, or even the

areas immediately abutting or surrounding their apartments.  While it is true that

Dawson and Smith may not have been able to take any steps to shield parking stall #143

from public scrutiny, the court finds that this was not because of any inability on their

part to protect their private spaces, but instead because the parking stall was not truly

one of those private spaces.  It was not, in short, an area "so intimately tied to the home

itself that it should be placed under the home's umbrella of Fourth Amendment

protection." *Depew*, 210 F.3d at 1066–67 (cleaned up).

To summarize:  The proximity factor may not weigh against a finding of

curtilage in this case, but it does not support one.  And the remaining three factors

weigh decisively against that finding.  The court therefore finds that parking stall #143

did not qualify as the curtilage of the Smith Residence.

### b.    In Searching the Silver Jeep, Law Enforcement Did Not Exceed the Scope of their Probable Cause

The remaining question is whether the officers exceeded the scope of their

probable cause in searching the silver Jeep, not only to retrieve the green duffle bag, but

also to sweep more broadly for any other evidence.  On this issue, the answer is

straightforward:  given all of the information the law enforcement officers participating

in this investigation collectively possessed at the time of the search, they

28

unquestionably had adequate probable cause to search the entire vehicle as they did.

That evidence included the fact that the Subject Parcels were addressed to the Smith

Residence and contained a substantial amount of a substance testing positive for

methamphetamine, as well as the officers' observations of Dawson retrieving one of the

Subject Parcels following the controlled delivery and bringing it to the silver Jeep that

he had just parked.  It also includes the fact two state search warrants had been

executed on vehicles controlled by Dawson in April 2024, both of which resulted in the

recovery of drugs and drug paraphernalia, and one of which resulted in the recovery of

ammunition.

Given that probable cause can be "based in part on reasonable inferences,"

*United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008), the court concludes that, here,

it was reasonable for the law enforcement officers to infer that the silver Jeep would

contain evidence related to the drug trafficking activity for which they had developed

evidence, just as Dawson had left evidence of that sort in other vehicles earlier in 2024.

The automobile search did not exceed the scope of the probable cause.[6]

---

[6]     The government does not identify which specific law enforcement officers knew which specific pieces of evidence, but the record supports the conclusion—and so the court finds—that the officers who collectively knew the relevant items of information were, by the time of the search of the silver Jeep on December 5, 2024, all working in close concert with one another on the investigation of Dawson and in communication with each other.  Dawson does not dispute this.  It follows that under the "collective knowledge" doctrine, the collectively knowledge of the officers working in tandem is the proper measure of probable cause.  *See United States v. Ramirez*, 473 F.3d 1026, 1033

29

B.      The Motion to Dismiss

In his motion to dismiss, Dawson contends that the firearm-related statutes he is alleged to have violated are unconstitutional.

### 1.      Dawson's Second Amendment Challenges Are Foreclosed by Ninth Circuit Precedent

His principal argument is that the statutes violate his Second Amendment rights. He asserts that 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (the statutes underlying Counts 3, 6, 8, and 10) are unconstitutional, both on their face and because his prior felony convictions are non-violent.  And while he does not elaborate on his reasons for arguing that 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(B)(i), and 924(c)(1)(B)(ii) (the statutes underlying Counts 4 and 9, collectively) are unconstitutional, his point is likely that under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), a prohibition on the possession of a firearm to further a drug trafficking offense is not consistent with the nation's historical tradition of firearm regulation.

Dawson acknowledges, however, that his Second Amendment challenges are currently foreclosed by binding Ninth Circuit precedent—most notably the Ninth Circuit's *en banc* decision in *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025).  *See* Dkt. No. 89, at PageID.452 (acknowledging that "for now, the *en banc* decision in *Duarte* is

---

(9th Cir. 2007) (quoting *United States v. Bernard*, 623 F.2d 551, 561 (9th Cir. 1980), for the proposition that when "officers involved were working in close concert with each other," then "the knowledge of one of them was the knowledge of all").

applicable to this Court"). He explains that he "raises this argument that Counts 3, 4, 6, 8, 9, and 10 are both facially unconstitutional and unconstitutional as applied to his circumstances" only because he believes "the dissent in *Duarte* offers the most legally and historically consistent analysis with both *Bruen* and the historical context in which the Second Amendment arose." Dkt. No. 89, at PageID.452. While recognizing that this court cannot currently entertain his contentions, Dawson "expects the United States Supreme Court will grant Duarte's petition and reverse the decision of the Ninth Circuit sitting *en banc*," and therefore raises his Second Amendment challenge merely "to preserve his rights in the event he is correct about the course the United States Supreme Court will take." *Id.* at PageId.451.

The court commends Dawson's candor, and agrees with his assessment of the current state of the Ninth Circuit's binding precedents.

For one thing, the Ninth Circuit did hold in *Duarte* that 18 U.S.C. § 922(g)(1) is not unconstitutional as applied to individuals convicted of non-violent felonies. 137 F.4th at 750. That decision, unless modified by either the Supreme Court or the Ninth Circuit, is binding on this court. The court therefore must deny Dawson's motion to dismiss the charges in Counts 3, 6, 8, and 10.

For another, the Ninth Circuit held in *United States v. Potter*, 630 F.3d 1260 (9th Cir. 2011), that 18 U.S.C. § 924(c) is constitutional. As the Ninth Circuit there explained, the Second Amendment protects "the *lawful* possession and use of a firearm," and so it

31

"cannot seriously be contended that the Second Amendment guarantees a right to use a firearm in furtherance of drug trafficking." *Id.* at 1261.  Although *Potter* was decided before *Bruen*, the Ninth Circuit's more recent decision in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), postdated *Bruen* and confirms the continuing vitality of *Potter* in this circuit.

In *Alaniz*, the Ninth Circuit considered the constitutionality, under *Bruen*, of § 2D1.1(b)(1) of the United States Sentencing Guidelines.  The defendant in *Alaniz* had received a two-level increase in his recommended sentence under § 2D1.1(b)(1) because "the government offered evidence that Alaniz possessed the seized firearms both temporally and spatially proximate to his drug trafficking," and he argued that this enhancement violated his Second Amendment rights.  *Id.* at 1127.  The Ninth Circuit rejected this argument, concluding that § 2D1.1(b)(1) was constitutional under the *Bruen* test "because it clearly comports with a history and tradition of regulating the possession of firearms during the commission of felonies involving a risk of violence." *Id.* at 1129; *see also id.* at 1130 (explaining that "[l]ike burglary or robbery, drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence").

This court is bound by published Ninth Circuit decisions unless they are "clearly irreconcilable" with intervening Supreme Court decisions.  *Miller*, 335 F.3d at 893. Given the Ninth Circuit's decision in *Alaniz*, this court cannot conclude that the circuit's

earlier decision in *Potter* is "clearly irreconcilable" with *Bruen*. *Accord United States v. Cash*, No. 22-2713, 2023 WL 6532644, at *3 & n.8 (3d Cir. Oct. 6, 2023) (explaining, in a post-*Bruen* decision, that "circuit courts have repeatedly rejected Second Amendment challenges to § 924(c) and U.S.S.G. § 2D1.1(b)(1), a similar provision under the United States Sentencing Guidelines, all concluding that the Second Amendment does not protect the right to possess a firearm for unlawful purposes," and favorably citing both *Potter* and *Alaniz*). The court therefore must deny Dawson's motion to dismiss the charges in Counts 4 and 9.

> **2.    Dawson's Commerce Clause Challenges Are Foreclosed by Ninth Circuit Precedent**

Dawson alternatively argues that the statutes underlying Counts 3, 4, 6, 8, 9, and 10 are unconstitutional because they exceed "Congress' limited power under the Commerce Clause." Dkt. No. 89, at PageID.446. But here again, Dawson acknowledges that "the Ninth Circuit has repeatedly upheld 18 U.S.C. § 922(g), both facially and as applied, in the face of a Commerce Clause challenge." *Id.* at PageID.453 (citing *United States v. Latu*, 479 F.3d 1153, 1156 (9th Cir. 2007)). The Ninth Circuit has also held that 18 U.S.C. § 924(c), when linked to an underlying drug trafficking crime, "does not exceed Congress' power under the commerce clause," because the underlying drug trafficking crime substantially affects interstate commerce. *United States v. Staples*, 85 F.3d 461, 463 (9th Cir. 1996), *overruled on other grounds by Muscarello v. United States*, 524

U.S. 125 (1998).  This court is bound by these precedents and therefore must reject

Dawson's Commerce Clause challenge.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, Dawson's motion to dismiss and motions to suppress

are DENIED.

IT IS SO ORDERED.

DATED:  January 16, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Cr. No. 24-00089 MWJS; *United States of America v. Duane F.K. Dawson*; ORDER
DENYING DEFENDANT'S MOTION TO DISMISS [DKT. NO. 89] AND MOTIONS TO
SUPPRESS [DKT. NOS. 90, 91]

34